ORIGINAL

## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>**ALBERT TALTON**<br>**PAUL MCCORRY**<br>**TROY STROUD**<br>**DAVID GOLDBERG** | **DOCKET NO.**<br><br>**MAGISTRATE'S CASE NO.**<br><br>FILED<br>CLERK, U.S. DISTRICT COURT<br>MAY - 9 2008<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY ___ <br>**08-1129M-1** |

Complaint for violation of Title 18, United States Code § 471 and § 473

| NAME OF MAGISTRATE JUDGE<br><br>Honorable Jennifer T. Lum | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSES<br>May 8, 2008<br>March 5, 2008<br>May 1, 2008 | PLACE OF OFFENSE<br><br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

### SEE ATTACHMENT

LODGED
MAY - 9 PM 1:15
CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT
LOS ANGELES

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the<br>foregoing is true and correct to the<br>best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>OFFICIAL TITLE<br>SA JASON SWIERKOWSKI - USSS |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br><br>SUZANNE H. SEGAL | DATE<br><br>May 9, 2008 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

TLW: vb

**Count One**: On or about May 8, 2008, in Los Angeles County, within the Central District of California, defendants ALBERT TALTON and DAVID GOLDBERG, acting with intent to defraud, falsely forged and counterfeited obligations and securities of the United States, namely, counterfeit Federal Reserve Notes.

**Count Two**: On or about March 5, 2008, in Los Angles County, within the Central District of California, defendant TROY STROUD sold and delivered counterfeit obligations and securities of the United States, namely, approximately $3700 in counterfeit hundred dollar ($100) Federal Reserve Notes, knowing that the money was counterfeit, and with the intent that such counterfeit money be passed, published and used as true and genuine.

**Count Three**: On or about May 1, 2008, in Los Angles County, within the Central District of California, defendant PAUL MCCORRY sold and delivered counterfeit obligations and securities of the United States, namely, approximately $2000 in counterfeit twenty dollar ($20) Federal Reserve Notes, knowing that the money was counterfeit, and with the intent that such counterfeit money be passed, published and used as true and genuine.

## AFFIDAVIT

I, Jason Swierkowski, being duly sworn and under oath, hereby depose and say:

1.    I am a Special Agent ("SA") of the United States Secret Service ("USSS"), and have been so employed since August 2003.  I am currently assigned to the Los Angeles Field Office, Counterfeit Squad, where I investigate violations of federal law relating to counterfeit United States currency.  I have received formal training at the Federal Law Enforcement Training Center and the USSS James J. Rowley Training Center.  My training included, but was not limited to, the methods and modus operandi of manufacturers and distributors of counterfeit United States currency and the identification of counterfeit currency.  During the performance of my duties, I routinely distinguish counterfeit from genuine United States currency and investigate cases involving the manufacture and distribution of counterfeit currency.  I have conducted and participated in investigations involving counterfeit currency.  I have also interviewed suspects and informants regarding the manufacture, sales, and passing of counterfeit currency.

2.    Except as otherwise noted, the information set forth in this affidavit is based on my own personal knowledge, as well as information from (a) oral and written reports I have received

1

from other federal agents, and other law enforcement agencies,

(b) interviews with cooperating informants and reports of same,

and (c) physical surveillance conducted by federal agents, which

has been reported to me either directly or indirectly.

3.    This affidavit is made for the sole purpose of
establishing probable cause for the requested complaint and
arrest warrants and does not purport to set forth all of my
knowledge of or investigation into this matter.

### PURPOSE OF AFFIDAVIT

4.    I make this affidavit in support of a criminal
complaint for the following individuals:

a. Albert TALTON (Count One: for violation of Title 18,
United States Code, Section 471: Counterfeiting Obligations or
Securities);

b. David GOLDBERG  (also charged in Count One: for
violation of Title 18, United States Code, Section 471:
Counterfeiting Obligations or Securities);

c. Troy STROUD (Count Two: for violation of Title 18,
United States Code, Section 473: Dealing in counterfeit
obligations or securities); and

d. Paul MCCORRY (Count Three: for violation of Title
18, United States Code, Section 473: Dealing in counterfeit
obligations or securities).

## PROBABLE CAUSE

**Summary**

5.    For approximately two years, agents of the United States Secret Service ("USSS") have been investigating a particular type of counterfeit note which has been widely distributed.  Indeed, the counterfeit notes in this investigation are of particular concern because they have a remarkable passing history and range; according to reports amassed by the USSS, these notes have been passed successfully throughout the United States and approximately $6,800,000 of these counterfeit notes have been passed or seized to date.  The notes are manufactured using inkjet technology and computers, and are to my knowledge one of the most successfully passed note using that technology to date.

6.    As part of this investigation, I and other agents of the USSS have identified a printer of these notes, as well as several brokers who sell large quantities of the notes (in $100 and $20 denominations) to others with the intent that the notes be eventually passed as genuine.  As discussed in more detail below, Albert TALTON has been identified as the main printer of the counterfeit money; he is assisted in this endeavor by David GOLDBERG, who cut the bills and glued them together.  Paul MCCORRY has been identified as a broker of the money and also as

3

someone who assists in printing the money, and Troy STROUD has been identified as a broker of the counterfeit money.  In each instance discussed below, the counterfeit money sold is the same $100 or $20 note.

7.    First, STROUD is a broker who has sold $3700 in counterfeit $100 bills to a source of information, and has discussed selling counterfeit $20 bills to a separate confidential informant.  In addition, on May 8, 2008, when STROUD was arrested, he admitted to selling large quantities of counterfeit money.

8.    Second, MCCORRY is a broker who has sold $2500 in counterfeit $100 bills on one occasion, and $2000 in $20 counterfeit bills on another, to two brokers named Correy Nero and Earnest Alexander, who then sold the bills to a third confidential informant.  On May 8, 2008, MCCORRY was in TALTON's house assisting in printing money; surveillance indicates that MCCORRY had worked extensively with TALTON to print the money.

9.    Third, both STROUD and MCCORRY obtain their counterfeit currency from TALTON.  TALTON prints the counterfeit bills at his residence, as evidenced by three trash searches and surveillance of TALTON purchasing large quantities of paper and ink and bringing them into his home.  Both STROUD and MCCORRY have been frequently seen at TALTON's residence, usually in connection with

4

a pending sale of counterfeit currency.  In addition, on May 8, 2008, a federal search warrant (signed by Magistrate Judge Paul L. Abrams on May 7, 2008) was executed at TALTON's residence.  In the home, a full-scale counterfeit currency manufacturing plant was found.  Following the search, TALTON admitted to manufacturing and selling large quantities of counterfeit currency.

10.  Finally, GOLDBERG assists TALTON in the manufacture of the counterfeit currency.  When the search of TALTON's home was executed, GOLDBERG was gluing papers with security watermarks printed on them to other paper.  Following the search GOLDBERG admitted to assisting TALTON with manufacturing the counterfeit currency by cutting and gluing paper.

**Investigation Regarding STROUD**

11.  As detailed below, STROUD has discussed selling large quantities of counterfeit currency with a source of information and undercover agents.  In addition, on March 5, 2008, STROUD sold that source of information $3700 in counterfeit $100 bills. Later in March, STROUD discussed selling a confidential informant counterfeit $20 bills, and provided a sample of same.  STROUD has been seen routinely at TALTON's residence, and on April 15, 2008, passed a counterfeit $20 bill at a business.  Finally, on May 8,

5

2008, STROUD was arrested and admitted that he had sold large quantities of counterfeit currency.

The February 27, 2008 meeting

12.  On or about February 14, 2008, USSS Special Agents Jay Montgomery and I met with a reliable source of information ("the SI")[1] at the Hermosa Hotel in Hermosa Beach, California.  The SI told SA Montgomery and me that the SI had, in the past, purchased counterfeit United States currency from STROUD approximately six times in quantities ranging from $10,000 to $30,000.  The SI also explained that STROUD purchases the counterfeit United States currency directly from the printer (meaning the person who makes the bills), which I believe to be TALTON.

13.  On or about February 19, 2008, USSS SA Matthew Mayo and I met with the SI at the Los Angeles Field Office of the USSS. The SI told me that STROUD drives a white-colored Range Rover Sport Utility Vehicle.

14.  On or about February 27, 2008, the SI introduced SAs Eldridge Armstrong and Russell Burrell, both of whom were acting

---

[1]  Based on the criminal record that I have reviewed, the SI appears to have been convicted in 1991 for possession with intent to distribute controlled substances, in 1999 for escape from federal custody and in 2005 for conspiracy to distribute controlled substances.  The SI is providing information in exchange for monetary compensation, and in the hopes of avoiding a parole violation for prior conduct.  The SI's information has been corroborated and reliable to date.

in undercover capacities, to STROUD at a restaurant in Los
Angeles.  SA Armstrong told me the following about what happened
during that meeting:

        a.   STROUD told SA Armstrong that he was involved in a
number of criminal enterprises to include the distribution of
counterfeit United States currency;

        b.   STROUD told SA Armstrong that his "printer"
(referring to a person, not a machine) could print and/or
counterfeit anything, with a special emphasis on counterfeit
United States currency; and

        c.   STROUD told SA Armstrong that he did not like
distributing counterfeit United States currency because he
considered it a "low budget" hustle.

The March 5, 2008 Sale of Counterfeit Currency

    15.  On or about March 5, 2008, I participated with other
Special Agents of the USSS in an undercover operation at STROUD's
residence.  The operation was not recorded.  Based on my
participation in that operation, as well as from what other
agents told me, I know that the following events took place:

        a.   SA Mayo searched the SI in the parking lot of
Jerry's Deli in Marina Del Rey, California.  SA Mayo found no
counterfeit currency or other contraband during that search;

b.   I searched the vehicle the SI was driving at the same location in Marina Del Rey, California.  I found no counterfeit currency or other contraband during that search;

c.   SA Mayo provided the SI with $1,000 in genuine United States currency to be used in the purchase of counterfeit United States currency;

d.   SA Millen told me that he observed STROUD arrive in his car.  The SI and STROUD briefly met in the street outside the residence.  SA McFarland observed STROUD and the SI enter the residence before closing the door behind them.  Approximately ten minutes later, SA McFarland observed the SI and STROUD exit the residence.  The SI and STROUD were then observed entering their vehicles and departing, SA Millen observed STROUD enter his white-colored Range Rover (which I have learned is registered to STROUD);

e.   USSS SAs maintained constant surveillance of the SI until SA Mayo and I met with him/her in the parking lot of Kaiser Permanente hospital in Culver City, California.  The SI gave me $3,700 in counterfeit United States currency that was contained within a white piece of paper.  The SI told me that when the SI entered STROUD's residence with STROUD, the SI observed STROUD go upstairs and return a short time later with a white piece of paper wrapped around the counterfeit money.  The

8

SI told me that he/she then paid STROUD $900 in genuine United States currency for the $3,700 in counterfeit United States currency. The SI returned the remaining $100;

      f.  I have examined the currency that STROUD provided the SI and determined it is counterfeit United States currency.

The March 14, 2008 and March 28, 2008 Meetings and Counterfeit

$20 Sample

16. On or about March 12, 2008, SA Mayo and I interviewed a USSS confidential informant ("CI-1")[2] at a restaurant in Marina Del Rey, California. CI-1 provided me with $1,500 in counterfeit United States currency that he/she had purchased from STROUD the previous day for $450 genuine currency with a future payment of an additional $150 genuine currency expected. That meeting was not recorded or supervised by law enforcement. I examined the counterfeit Federal Reserve Notes CI-1 provided and they are the same type of counterfeit note that the SI had previously purchased from STROUD on or about March 5, 2008. CI-1 further explained to me that he/she had agreed to meet STROUD on or about

---

    [2] Based on the criminal record that I have reviewed, CI-1 appears to have been convicted in 1999 for transport/sell controlled substances, a felony, and in 2004 for conspiracy to distribute controlled substances, a felony. CI-1 is providing information in exchange for monetary compensation, and in the hopes of avoiding a parole violation for prior conduct. I have been informed by CI-1's probation officer that CI-1 has recently tested positive for cocaine use. CI-1's information has been corroborated and reliable to date.

Friday, March 14, 2008, to discuss a plan to exchange genuine currency with counterfeit currency inside a financial institution.

17.   On or about March 14, 2008, CI-1 met SAs Mayo, Brame, and me near the Los Angeles International Airport.   SA Brame searched CI-1 and confirmed he/she did not possess any contraband, specifically counterfeit United States currency.   SA Mayo and I searched CI-1's vehicle and confirmed that the vehicle contained no contraband, specifically counterfeit United States currency.   CI-1 was then provided with electronic surveillance equipment to record the meeting and surveilled by USSS agents and me to a restaurant in Marina Del Rey, California. Other agents of the USSS who were on the surveillance that day told me the following:

        a.   CI-1 was observed meeting with STROUD, a female known as "T", and another unidentified black male in the bar area of the restaurant;

        b.   An unidentified black male who appeared to be acting as a "lookout" was observed outside the restaurant while the meeting was taking place.

18.   Following the meeting I met with CI-1 on a residential street to debrief and obtain the electronic recorders and transmitters.   CI-1 stated that STROUD had discussed the

10

counterfeit currency with him/her and agreed to meet at a later date.   CI-1 stated that he/she did not receive any counterfeit currency during the meeting.

19.   On or about March 17, 2008, I listened to the compact disc containing the recorded meeting on or about March 14, 2008, between CI-1 and STROUD.   STROUD made the following statements some of which were in code, but which I understood to reference counterfeit currency:

a.   He could provide CI-1 with $5,000 in counterfeit currency;

b.   He loves the new $20 counterfeit notes;

c.   The printer puts in the same amount of work in making the $20 counterfeit notes as the $100 counterfeit notes and the rate is different;

d.   He knows what price he is getting the counterfeit money for;

e.   CI-1 will never lose using the $20 counterfeit notes;

f.   STROUD also spoke about another fraud scheme with CI-1.

20.   On or about March 27, 2008, SA Mayo and I instructed CI-1 to place a three-way, monitored call to STROUD to try to arrange for STROUD's delivery of samples of counterfeit notes.

During the call between CI-1 and STROUD, I heard STROUD indicate that he would contact his source of the counterfeit notes and call CI-1 back to arrange for the delivery.

21.  On March 28, 2008, SA Brame and I met CI-1 in Santa Monica, California.  SA Brame and I searched CI-1 and CI-1's vehicle and confirmed that CI-1 did not possess any contraband, specifically counterfeit currency.  SA Brame and I then provided CI-1 with multiple recording devices to record the meeting between CI-1 and STROUD.  CI-1 was then surveilled by SA Brame and me to an agreed upon meeting with STROUD at a restaurant in Playa Vista.  The following events took place after CI-1 arrived:

a.  SA Sato told me she observed CI-1 meet STROUD outside the restaurant;

b.  SA Mayo told me he then observed STROUD walk to STROUD's vehicle and open the front passenger door;

c.  SA Mayo observed CI-1 walk up to STROUD who was seated in the passenger seat of his vehicle with the passenger door still open;

d.  SA Mayo could see STROUD handling numerous $20 bills, but was unable to determine if they were counterfeit from that distance;

12

e.   SA Mayo told me that CI-1 and STROUD appeared to be having a conversation and he observed CI-1 examining one of the notes; and

f.   SA Mayo then observed STROUD hand CI-1 a white-colored envelope.

22.   SAs of the USSS then surveilled CI-1 as he/she walked to his/her vehicle and departed.   SA Brame and I maintained constant surveillance of CI-1 until we met CI-1 near the Coast Guard Station in Marina Del Rey, CA.   It was at this time that CI-1 provided me with a white-colored envelope that contained one counterfeit $20 bill.   CI-1 told SA Brame and me the following:

a.   STROUD had three counterfeit $20 bills that he retrieved from under one of the seats inside his vehicle, but only provided CI-1 with one of them as a sample;

b.   STROUD used genuine currency to compare with the counterfeit $20 bills;

c.   STROUD gave CI-1 a white-colored envelope and told him/her to put the counterfeit money inside the envelope.

23.   I have examined the $20 note that CI-1 provided to me and determined that it is counterfeit.

24.   I have listened to the recording of the meeting between CI-1 and STROUD on April 1, 2008.   The recording is difficult to hear in parts, but I heard STROUD say the following on the

13

recording referring to the counterfeit currency (my interpretations are included in parentheses, and are based on my training and experience and knowledge of the investigation):

a.   "I'm going to let you take one, whichever one you want" (meaning, in my opinion, that STROUD would let CI-1 take one bill as a sample);

b.   "This one right here, I'm going to tell you everything that is wrong with it, but there won't be anything wrong with it when I pick it up tonight" (meaning, in my opinion, that the sample counterfeit note was not perfect, but the entire purchase to be made later would not have the same flaws);

c.   "They take the pen" (referring, in my opinion, to the pen used by some businesses to attempt to detect counterfeit money);

d.   "They come on slabs" (referring, in my opinion, to the paper used to print the counterfeit money);

e.   "He cut it crooked because he was in a rush to give it to me" (meaning, in my opinion, that the printer was in a rush to give STROUD a sample); and

f.   "When the new $100s come out, I'll give you a new rate.  He is making more while I'm out passing these."

25.  On or about April 8, 2008, I received call records for the months of January and February 2008 for STROUD's cellular

14

telephone, XXX-XXX-0505.  We identified phone number XXX-XXX-9447, which was later identified as belonging to TALTON, as a primary phone number being contacted.

April 15, 2008 Passing of Counterfeit Money

26.  On or about April 15, 2008, SAs Mayo, Lee, and I surveilled STROUD to Popeye's Chicken, 957 N. La Brea Avenue, Inglewood, CA.  SA Lee observed STROUD in the drive-thru line. SA Mayo entered the store and identified himself to Manager Patricia Sanchez.  Sanchez allowed SA Mayo behind the counter. SA Mayo observed STROUD at the drive-thru window at that time. STROUD handed Sanchez a counterfeit $20 bill to pay for his order.  Sanchez immediately handed SA Mayo the counterfeit $20 bill and SA Mayo confirmed it as counterfeit at that time. Sanchez then handed STROUD his change and STROUD was not arrested at that time.  SA Mayo then showed Sanchez a photo line-up and she identified STROUD as the person who passed her the counterfeit note.  Sanchez circled the photo of STROUD and initialed next to the photo.

May 8, 2008 Statement by STROUD

27.  On May 8, 2008, STROUD was arrested.  Later that day, he was interviewed by SA Lonnie Falgout and I at the USSS Los Angeles Field Office.  STROUD was advised of his <u>Miranda</u> Rights, and he voluntarily signed a written waiver of those rights.

15

28.   STROUD stated that between January 2008 and May 2008 he purchased between $42,000 and $62,000 of counterfeit currency from a friend named "Al" [TALTON] on five to ten separate occasions at TALTON's house in Hawthorne near La Brea.   STROUD claimed to have met TALTON in jail six to seven years ago. STROUD stated that TALTON has been printing counterfeit money for approx two to three years.   STROUD continued that he witnessed TALTON making the counterfeit money at his residence using two computers and three printers.   STROUD stated that TALTON would print the counterfeit bills five per sheet of paper and then hang all of the bills in the garage to be sprayed with hairspray so that they could "take" the counterfeit detection markers utilized by many merchants.   STROUD added that he often saw stacks of counterfeit money in TALTON's office (within the residence) ready to be cut.   STROUD also identified MCCORRY as a person that was a worker in the house, meaning in my training and experience, that MCCORRY worked with TALTON to print the counterfeit currency. STROUD said that he was paying TALTON "1-for-6," meaning that for every $6 in counterfeit STROUD would pay $1 in genuine currency. STROUD stated that he personally profited from the sale of counterfeit currency in the amount of $5,000-$10,000.

16

**Investigation Regarding MCCORRY**

29.  As detailed below, MCCORRY has twice obtained counterfeit currency from TALTON, then sold it to the broker team of Nero and Alexander, who have then sold the counterfeit money to a different confidential informant.  In addition, he has been surveilled numerous times at TALTON's residence, even using his own key to enter and remain for long periods of time; I believe that he assists in printing the money.  Finally, on or about May 8, 2008, another order was placed with MCCORRY's broker team for counterfeit currency.  When a federal search warrant was executed on TALTON's residence, MCCORRY was in the house with TALTON and the large counterfeit currency manufacturing plant, in my opinion assisting with the manufacture of the counterfeit money for the sale.

The April 10, 2008 Sale of Counterfeit

30.  USSS SA Victor Lee has informed me of the following regarding an April 10, 2008 counterfeit money transaction (including paragraphs 30 through 36):  On April 10, 2008, a confidential informant ("CI-2")[3], at SA Lee's direction, made a consensually-monitored and recorded telephone call to a person

---

[3] CI-2 has provided information in exchange for monetary compensation.  CI-2 has previously been convicted of forgery (misdemeanor), as well as a few other misdemeanors.  CI-2's information has been corroborated and reliable to date.

17

named Earnest J. Alexander to arrange to purchase $2,500 in counterfeit one-hundred dollar bills.  CI-2 and Alexander agreed to meet for the exchange at Alexander's apartment complex located on Kornblum Avenue in Hawthorne, California ("the Kornblum complex parking lot").

31.  On April 10, 2008, USSS SAs Jay Huang and Lee, while at a staging area in Hawthorne, CA, searched CI-2 and CI-2's vehicle before CI-2 conducted the transaction with Alexander.  Neither SA Huang nor Lee found any counterfeit currency or any other contraband during this search.  SA Lee gave CI-2 $750.00 in genuine currency and instructed CI-2 to purchase $2,500.00 in counterfeit currency.  Furthermore, SAs Huang and Lee activated and then placed a recording device on CI-2's person to record the activity during the transaction.  At that time SA Huang and SA Lee monitored CI-2 and his vehicle while he drove to the Kornblum complex parking lot.  At the parking lot, SA Nolan Sabin and SA Adam Kamann surveilled the following transaction.  SA Lee also debriefed CI-2 after the transaction, and reviewed the recording and confirmed that the following occurred.

32.  At approximately 11:20 AM that day, USSS SAs observed an orange Mercedez Benz coupe bearing CA license plate "MCCORRY" driven by a black male (later identified by DMV photo and surveillance as Paul T. MCCORRY as detailed in paragraph 33)

parked in the parking lot. At approximately 11:25 AM, a person later identified as Corey Lamont Nero arrived at the meet location in a black Cadillac. Nero got out of his car and entered the passenger seat of MCCORRY's car.

33. After the orange Mercedes Benz with license plate "MCCORRY" was observed, MCCORRY was identified in the following manner, as told to me by SA Lee. SA Lee queried a California Department of Motor Vehicles ("DMV") database, and learned that the car was registered to Helene McCorry at a West Covina address. SA Lee then learned from information obtained from another database that a person named Paul MCCORRY also lived at that same address. SA Lee then obtained a California DMV photograph of MCCORRY. SA Mayo told me that he has compared the person that he has seen at TALTON's residence numerous times with that photograph, and believes that it is the same person.

34. At approximately 11:35 AM, CI-2 arrived at the Kornblum complex parking lot, parked, and was immediately greeted by Nero. MCCORRY then drove out of the parking lot and headed South on Kornblum Ave. While CI-2 and Nero were waiting for Alexander to arrive, Nero showed CI-2 a counterfeit twenty dollar bill as a sample of bills that were currently being manufactured and told him that CI-2 could purchase them later that day. I believe based on my training and experience, and knowledge of the

19

investigation, that MCCORRY provided the counterfeit bills to Nero.

35.  When Alexander arrived, Nero handed Alexander a stack of counterfeit one-hundred dollar bills.  Alexander then gave CI-2 twenty five counterfeit one-hundred dollar bills in exchange for $750 in genuine currency.  Alexander then counted out thirty of the genuine twenty dollar bills ($600) that CI-2 gave Alexander and handed them to Nero.  After the exchange, all parties left the parking lot.

36.  After CI-2 left the parking lot, SA Huang and SA Lee followed CI-2 back to the staging area.  SA Lee searched CI-2 and CI-2's vehicle and recovered and verified the $2,500.00 in counterfeit one-hundred dollar bills.

The May 1, 2008 Sale of Counterfeit Currency

37.  SA Lee has informed me of the following regarding a May 1, 2008 counterfeit money transaction (including paragraphs 37 through 45): On May 1, 2008, CI-2, at SA Lee's direction, made a consensually-monitored and recorded telephone call to Alexander to arrange to purchase $2,000.00 in counterfeit twenty dollar bills.  CI-2 and Alexander agreed to meet for the sale of the counterfeit currency in the Kornblum complex parking lot.

38.  On May 1, 2008, SAs Huang and Lee, while at a staging area in Hawthorne, CA, searched CI-2 and CI-2's vehicle before

20

CI-2 conducted the transaction with Alexander.  Neither SA Huang nor SA Lee found counterfeit currency or any other contraband during this search.  SA Huang and SA Lee gave CI-2 $725 in genuine currency and instructed CI-2 to purchase $2,000 in counterfeit twenty dollar bills.  SA Huang and SA Lee activated and then placed a recording device on CI-2's person to record the activity during the transaction with Alexander.  From the staging area, SA Huang and SA Lee monitored CI-2 and his vehicle to the Kornblum complex parking lot.  At the parking lot, SA Mark McFarland and SA Adisa Pot surveilled the following transaction. SA Lee also debriefed CI-2 after the transaction, and reviewed the recording and confirmed that the transaction occurred as reported below.

39.  SA Jeffrey Stohler was, at the same time, surveilling TALTON's residence (as detailed below in paragraphs 52-70, TALTON prints the counterfeit money at his residence).  SA Stohler observed MCCORRY arrive at TALTON's residence in the same orange Mercedez Benz coupe as in the April 10 transaction and walk inside.  Within ten minutes, MCCORRY left TALTON's residence. [STROUD and MCCORRY'S cars were also seen parked at TALTON's residence on April 11, 2008].

40.  At approximately 12:20 PM, Nero arrived at the Kornblum complex parking lot in the same black Cadillac sedan as in the

21

April 10 transaction and was allowed into the gated tenant
parking area.  A few minutes later, MCCORRY arrived at the
parking lot in his orange Mercedez Benz coupe and was allowed
into the gated tenant parking area.  At approximately 12:35PM,
MCCORRY left the parking lot in the orange Mercedez Benz.  SA Lee
and I believe based on our training and experience and knowledge
of the investigation that MCCORRY provided Nero with counterfeit
money obtained from TALTON.

    41.  Soon thereafter, CI-2 met with Alexander, who told CI-2
that "he" [referencing MCCORRY] had brought the wrong
denominations for CI-2's order and had to go pick up the correct
amount.  Alexander said that since Nero had to return to work,
the deal would be relocated to Nero's workplace, located on
Buckingham Parkway, near the intersection of La Cienega Blvd. and
Slauson Ave.  Nero then joined Alexander and CI-2 and handed CI-2
three counterfeit twenty dollar bills as a means of apology for
MCCORRY's error. (These bills were later taken from CI-2 as
detailed below in paragraph 45).

    42.  Shortly thereafter, SA Stohler saw MCCORRY return to
TALTON's residence, go inside for a few minutes, and then depart
again.  SA Lee and I believe based on our training and experience
and knowledge of the investigation that MCCORRY returned to

TALTON's residence to get the correct counterfeit currency for the impending transaction.

43.  CI-2, Nero and Alexander then got into their respective cars.  USSS SAs surveilled CI-2 as he followed Alexander to 5730 Buckingham Parkway, Culver City, CA 90230.  Nero drove separately, and was not surveilled; SA Lee believes based on his knowledge of the investigation and his training and experience that Nero returned to his workplace and then met with MCCORRY prior to coming to the transaction location.  A few minutes after CI-2 and Alexander arrived at 5730 Buckingham Parkway and parked at the curb, SA Huang and SA Lee saw Nero's black Cadillac sedan parked in an adjacent parking lot, next to 5732 Buckingham Parkway.  A few minutes later, at approximately 1:15PM, Nero moved his car around the corner, and then approached Alexander's car on foot.  Meanwhile, USSS SAs observed that MCCORRY (who SA Lee believes had just met with Nero) had arrived at the transaction location and parked his orange Merecedez Benz coupe across the street from Alexander's car.

44.  At approximately 1:20PM, Nero and CI-2 got into Alexander's car.  Nero handed Alexander $2,000.00 in counterfeit twenty dollar bills.  Alexander then handed the counterfeit money to CI-2 in exchange for $725.00 in genuine  currency.  After

23

counting $2,000.00 in counterfeit twenty dollar bills, CI-2
exited Alexander's car, entered his car, and departed.

45.  SA Huang and SA Lee then followed CI-2 back to the
staging area.  They searched CI-2 and his/her vehicle and
recovered and verified the expected $2,000.00 in counterfeit
twenty dollar bills along with the three counterfeit twenty
dollar bills that Nero had given to CI-2 (discussed in paragraph
41).

Surveillance of MCCORRY at TALTON's Residence

46.  Between April 28, 2008 and May 8, 2008, USSS agents
conducted videotaped surveillance of TALTON's residence.  During
that time, MCCORRY was seen at the house almost every day for
extended periods of time, and several times was seen using a key
in his possession to unlock and lock the door to TALTON's
residence.  For example, on April 29, 2008, Operational Support
Technician ("OST") James Byers saw MCCORRY exit the residence,
pull the trash bin out to the curb (the same trash bin searched
as discussed below in paragraphs 54, 63 and 64), and place a box
onto the trash.  MCCORRY then used a key to lock TALTON's door,
and drove away in the orange Mercedes Benz with TALTON in the
front passenger seat.

47.  On May 1, 2008, MCCORRY entered TALTON's residence.
Some time later, an unknown male arrived at the residence, and

24

was seen by OST Byers standing next the front door counting a large quantity of money.  The male dropped a few of the bills, did not pick them up, and entered the residence.  A few minutes later, OST Byers saw MCCORRY leave the residence; on his way out, MCCORRY picked up the money and departed.

48.   MCCORRY also was observed going with TALTON to pick up paper at the Paper Mart in Los Angeles on April 30, 2008, as detailed below in paragraphs 59-61.  MCCORRY and TALTON then returned to TALTON's residence.

The May 8, 2008 Order of Counterfeit and Search of TALTON's Residence

49.   On May 8, 2008, CI-2, at SA Lee's direction, made a consensually-monitored and recorded telephone call to Alexander to arrange to purchase $15,000 in counterfeit currency (discussed in a previous recorded call to include both $20s and $100s).  CI-2 and Alexander agreed to meet at approximately 1:00 p.m. for the sale of the counterfeit currency in the Kornblum complex parking lot.

50.   Shortly after that call, MCCORRY was seen by SA Fred McCleverty arriving at TALTON's residence and going inside. Later, at around noon, SA McCleverty saw MCCORRY come out of the house, get into his car, and for a period of time do something looking down at his hands.  MCCORRY then suddenly looked up, and

25

pounded on the dashboard of the car, in a manner that appeared exasperated.  MCCORRY then walked inside the house.  I and the other agents believe based on our knowledge of the investigation and our training and experience that MCCORRY was frustrated by not having the counterfeit bills ready to sell to Nero and Alexander.  We believe that TALTON and MCCORRY were then printing the counterfeit currency.

51.  As detailed below, on May 8, 2008, a federal search warrant was executed at TALTON's residence.  At the time, MCCORRY was present inside the residence on the second floor, where, as detailed below in paragraph 65, the counterfeit currency manufacturing was taking place.

## Investigation Regarding TALTON

52.  As detailed below, counterfeit currency brokers STROUD and MCCORRY have been surveilled visiting TALTON's residence, where TALTON prints the counterfeit money.  Three separate trash searches have revealed a large number of items associated with printing counterfeit currency, including paper, ink for inkjet printers, hairspray, gloves, and scraps of paper with bits of printed $20 and $100 bills on them.  In addition, TALTON has purchased large quantities of paper and ink for inkjet printers and brought them into his home.  Finally, on May 8, 2008, TALTON's home was searched pursuant to a federal search warrant,

26

and an extensive counterfeit currency manufacturing plant was found.  Following the search, TALTON admitted that he had been manufacturing and selling large quantities of counterfeit currency.

April 24, 2008 Trash Search of TALTON's Residence

53.  On or about April 23, 2008, I surveilled STROUD to a residence at 14821 Larch Ave, Lawndale, CA.  I observed STROUD enter the premises.  I later observed STROUD exit the front door of the premises with a black male subject, whom I later identified (as discussed below in paragraph 55) as TALTON.  It appeared to me that STROUD and TALTON were having a conversation outside the front door of the premises before STROUD departed. Based on surveillance detailed below, as well as the trash searches, I have identified this residence as TALTON's residence.

54.  On or about April 24, 2008, SAs Mayo, Millen and I conducted a search of the trash belonging to TALTON's residence. On that day, SA Mayo observed the trash can on the curbside on Larch Avenue, and it had the numbers "14821" on the side of it, which is the house number for TALTON's residence.  During the search I identified the following items consistent with the printing of counterfeit United States currency:

a.  Many paper clippings with ink on the edge that appear to match the edge of a counterfeit $20 bill;

27

b.   13 bottles of Aqua Net hair spray (based on my training and experience, I know that hair spray is sometimes sprayed on counterfeit currency to prevent detection by the pen frequently used by many businesses to detect counterfeit; the hair spray on the paper will oftentimes block the solution inside the counterfeit detection pen from reacting with the paper);

c.   One piece of newspaper print paper (based on my training and experience, I know that this type of paper is often used to manufacture counterfeit currency; indeed, TALTON was observed buying large quantities of this type of paper as detailed in paragraphs 58-61);

d.   One Staples receipt for the purchase of two HP 97 color print cartridges, ten HP 96 black ink print cartridges, four HP 88XL print cartridges wrappers, twenty-six HP 97 tricolor print cartridges wrappers, and six HP 88 print cartridges wrappers (the subject counterfeit notes in this investigation are printed using ink-jet printing technology);

e.   One box for an HP Officejet Pro K8600 printer.

f.   One prescription receipt belonging to ALBERT TALTON (which led me to identify TALTON, below).

55.  I identified TALTON on or about April 24, 2008, when SAs Millen, Mayo, and I surveilled a green-colored Mercedes Benz

28

car from TALTON's residence to Denny's Restaurant in Hawthorne, CA. SA Mayo entered the restaurant and observed a black male seated at a table. The person seated at the table appeared to SA Mayo to be the same person STROUD had previously met with on April 23, 2008, at TALTON's residence. On that same day, SA Millen told me that, based on the name on the pharmacy label found during the trash search (referenced in paragraph 54f), he queried the California Department of Motor Vehicles and identified TALTON's California driver's license and photograph. SA Mayo and I believe that TALTON's California driver's license photograph appears to be the same person I observed STROUD meet with on April 23, 2008, and SA Mayo saw in the restaurant on April 24, 2008.

56. SA Nolan Sabin told me that on or about April 25, 2008, he interviewed J.T., Manager at the Staples office supply store in Hawthorne, CA. SA Sabin stated he provided J.T. with the transaction number, amount, date, and the time of the transaction from the receipt we retrieved from the search of the garbage from TALTON's residence on April 24, 2008. SA Sabin stated that J.T. was able to retrieve the information related to that purchase and the Staples rewards number associated with that account from the Staples database. SA Sabin stated that J.T. told him the following:

29

a.   J.T. remembered the person that made the purchase;

b.   J.T. was able to retrieve all account activity related to Staples Rewards number XXXXXXX0879 from November 15, 2007 until April 25, 2008;

c.   J.T. was unable to obtain the name associated with the account at that time and he did not know his name;

d.   J.T. told him that the individual who made the purchase comes into the store approximately once a week to purchase ink (for printers);

e.   J.T. explained that the individual purchases so much ink that they have to go to the back of the store to get more packages of ink from storage;

f.   J.T. stated that the individual usually purchases packages of HP96 black or HP97 tricolor ink cartridges;

g.   J.T. also told him that the individual deposits his used ink cartridges at the store for recycling;

e.   J.T. provided SA Sabin a printout of the transaction history related to the account.

57.   SA Sabin told me that on April 29, 2008, he interviewed Ed Contreras, Loss Prevention Manager for Staples, and Contreras confirmed that the name associated with Staples Rewards number XXXXXXX0879 is Albert TALTON.

30

April 30, 2008 Purchase of Paper

58.  On April 30, 2008, SA Mayo observed STROUD walk toward and into TALTON's residence with United States currency in his hand and enter the residence through the front door (SA Mayo could not determine if the currency was genuine or counterfeit from his location).  Approximately fifteen minutes later, SA Mayo observed STROUD depart the residence.

59.  On April 30, 2008, SA Quincy Torregano surveilled TALTON and MCCORRY to the Print Mart in Los Angeles, CA.  SA Mayo arrived a short time later and observed TALTON and MCCORRY at the Print Mart.  After SA Mayo observed TALTON and MCCORRY depart, SA Mayo spoke to D.G., Director of Operations at the Paper Mart.  SA Mayo was provided with the original receipt from the purchase that day.  The receipt shows a purchase of three bales of newspaper print paper.  TALTON is listed as the buyer on the receipt.  It also appears that TALTON signed the receipt. D.G. did not directly deal with the customer, but introduced SA Mayo to A.D., a forklift operator at the warehouse.  SA Mayo showed A.D. a six-pack of photos and A.D. positively identified TALTON as a person he had previously seen that day.  D.L., another employee of the Paper Mart, also provided SA Mayo with a compact disc showing TALTON enter the warehouse area and walk to the cashier area.

31

60.  Based on my training and experience, I know that newspaper print paper is commonly used when printing large quantities of counterfeit currency because it feels more consistent with genuine currency than other types of paper.  I also know that each bale of newspaper print paper purchased by TALTON consists of 1500 sheets of paper.  Based on my training and experience, I believe that approximately 27,000 counterfeit bills (with two printed images cut out and glued together) could be printed from the three bales of paper.

61.  Continuing on April 30, 2008, SA Mayo observed TALTON unloading large and heavy boxes into his residence.  SA Mayo told me that he believes that these boxes are the paper that TALTON purchased at Paper Mart.

62.  In addition, SA Stohler told me that on May 1, 2008, he and District Attorney Investigators Alonso, Sleeth, and Tobe surveilled TALTON from his residence to a business location in Orange County, Packaging Effects Incorporated.  SA Stohler stated that TALTON went into the lobby of the business and within a few minutes returned to his vehicle with what looked like a pink invoice sheet of paper.  At that time, TALTON drove his vehicle around to the loading dock area.  A Hispanic male helped TALTON load three boxes into the rear of TALTON'S vehicle.  SA Stohler stated that the boxes appeared to be heavy and pliable, and also

32

appeared to have paper inside the boxes.  SA Stohler stated that
they surveilled TALTON return to his residence.

May 1, 2008 Trash Search of TALTON's Residence

63.  On or about May 1, 2008, Lead Operations Support
Technician Marengo, SA Millen, and SA Mayo conducted a second
search of the trash belonging to TALTON's residence.  On that
day, SA Millen observed the trash can on the curbside on Larch
Avenue.  SA Millen told me the trash can had the numbers "14821"
on the side, which is the street number for TALTON's residence.
During the search, SA Mayo identified the following items,
consistent with the printing of counterfeit United States
currency;

a.   Many paper clippings;

b.   One piece of scrap paper bearing approximately the
upper third of a counterfeit United States $100 Federal Reserve
Note;

c.   The lower front corner of a counterfeit $20
Federal Reserve Note;

d.   One HP Scanjet 4070 image zone software compact
disc;

e.   One Package Spot receipt for the purchase of one
bundle of blank newsprint sheets of paper;

f.   Twelve HP 88 ink cartridge wrappers;

33

g.    Five light blue gloves;

h.    Nine windows XP printer test page sheets;

i.    Numerous pieces of paper;

j.    One HP color laserjet black print cartridge;

k.    One box labeled exact vellum Bristol Wausau paper

and one box labeled Imation laser pre-perfed uniform #20

heavyweight carbonless paper.

May 8, 2008 Search of TALTON's Residence

    64.  On May 8, 2008, SAs Hirtle, Hogan, and Mayo searched

the trash at TALTON's residence in a manner similar to the

previously discussed trash searches.  During the search, SA Mayo

recovered items including: newspaper print paper, paper clippings

showing a counterfeit security strip, one receipt for the

purchase of 25 pounds of unprinted newsprint, nine bottles of

Aqua Net hair spray, and a piece of paper bearing the image of

Benjamin Franklin (which appears to me in my training and

experience to be an attempt to duplicate the watermark used in

genuine currency).

    65.  On May 8, 2008, USSS SAs executed a Federal search

warrant authorized by U.S. Magistrate Judge Paul Abrams (on May

7, 2008) on TALTON's residence.  MCCORRY, TALTON and GOLDBERG

were present at the time of entry.  TALTON was located in the

upstairs bedroom.  The house contained an active counterfeit

currency plant, with the following items, among others, being found:

     a.  Approximately $820,000 in partially completed counterfeit bills;

     b.  Approximately $240,000 in completed counterfeit bills;

     c.  Multiple paper cutters;

     d.  Shredded counterfeit clippings;

     e.  Piece of wax paper bearing a security thread and watermark;

     f.  Many used HP 97 Ink cartridges;

     g.  Many HP Pro K8660 Printers, one HP Laser Printer, one HP Color Laser Jet 2840, one HP DeskJet 9800 printer, and an HP computer tower;

     h.  Many boxes of printing paper; and

     i.  One bag containing 9 bottles of Aqua Net hair spray, one bag containing 8 bottles, and three cans of White Rain hair spray.

    66.  Following TALTON's arrest on May 8, 2008, he was interviewed by SA Mayo.  SA Mayo advised TALTON of his <u>Miranda</u> rights; TALTON voluntarily signed a written waiver of those rights.

67.   TALTON stated that approximately two years ago, he began to experiment with manufacturing counterfeit currency with a $10 bill that he had scanned into his computer.  Over the next few months, using computer software to refine and produce a better quality counterfeit image, he began to print counterfeit $10 bills.  TALTON indicated that at this time he was not selling the counterfeit currency, but passing it himself for his own gain.  TALTON later decided to print larger denominations, particularly the $100 bills.  TALTON began to do research in an attempt to find a much thinner grade of paper to print the counterfeit onto, and also to enable him to put a security strip and watermark in between the papers.

68.   TALTON stated that he scanned a genuine $100 bill into his computer in order to manipulate the image so as to make a good, clear template to manufacture the counterfeit $100 bills.  TALTON described in detail how he would manufacture the counterfeit currency, including how he would compress two pieces of paper together using a sticker-maker machine.  TALTON added that the bill used for his $100 counterfeit template on his computer was a 2001 series note.  TALTON recalled that he would continually re-adjust and manipulate the image on his template in order to achieve a more perfect image on the counterfeit bills printed.  TALTON stated that in February 2008 he printed

36

approximately $30,000 in counterfeit $20 bills using a thicker grade of newsprint paper from paper supplier Paper Effects in Orange, CA.  He utilized this paper because the paper was thick enough to make a single pass bill, printed front and back, without using any adhesive to bond the paper together.  TALTON continued that he sold the counterfeit $20 bills at the 8-to-1 ratio, netting him approx $4,000 in genuine money from the sale of the counterfeit.

69.  TALTON stated further that he sold the counterfeit $100 bills at a price of 6-to-1, in quantities of $6,000-$10,000, meaning that for every $100 in genuine currency, TALTON would provide $600 in counterfeit $100 bills.  TALTON stated that this continued for approximately six to eight more months until he changed his sale ratio from 6-to-1 to 8-to-1.  He indicated that when his ratio was 6-to-1, he would sell the counterfeit usually in $6,000-$10,000 increments.  When the ratio changed to 8-to-1, TALTON would sell the counterfeit in increments of $30,000-$40,000 each sale.

70.  In total, TALTON estimated that from approximately April 2006 to May 2008, he manufactured and sold approx $5,000,000-$6,000,000 in counterfeit money.  TALTON added that he profited from the sale and distribution of the counterfeit money approximately $800,000-$900,000 in genuine money.

**Investigation Regarding GOLDBERG**

71.  On May 8, 2008, upon the execution of the search warrant on TALTON's home, GOLDBERG was seen by SA Millen in the kitchen area, standing next to a stack of papers and a machine with cylinders and a hand crank that is used to glue papers together (adhesive materials feed into the machine and transfer the glue onto newsprint, and then the machine is used again to transfer the glued newsprint to other newsprint).  One side of the paper had, in SA Millen's opinion, imitation watermarks and security threads.  In my opinion, based on my training and experience and knowledge of the investigation, this was done before the image of the bill was printed onto the paper so that the security features appeared to be under the print as in genuine currency.

72.  According to OST Byers, who was conducting surveillance at TALTON's residence, GOLDBERG was seen (by Byers) on or about April 29, 2008 entering TALTON's residence and then leaving after staying for several hours.

73.  On May, 8, 2008, following his arrest, SA Lee interviewed GOLDBERG.  SA Lee advised GOLDBERG of his <u>Miranda</u> rights; GOLDBERG voluntarily signed a written waiver of those rights.

38

74.  During the interview, GOLDBERG told SA Lee that he assisted TALTON in manufacturing counterfeit currency.  GOLDBERG stated that approximately one year ago, while he was visiting TALTON at TALTON's residence, he observed a stack of approximately 1000 sheets of letter sized paper bearing five or six face plate images of $100 bills stacked on the kitchen counter.  Approximately six months later, TALTON asked GOLDBERG if he wanted to earn some money.  When GOLDBERG expressed interest, TALTON provided sheets of paper for GOLDBERG to cut individually with a paper cutter.  GOLDBERG informed me that when he first started cutting the paper, he did not know what the paper was used for, but figured out shortly thereafter that the paper was being cut to manufacture counterfeit currency. GOLDBERG claims that he was paid approximately $200 for each of the five or six times that he aided TALTON in cutting paper. GOLDBERG admitted that when the search warrant was executed earlier that day, he was downstairs in the kitchen area, using a rolling device to glue one unprinted face sheet to a back sheet bearing printed false watermark and security threads on the front.

### CONCLUSION

75.  Based on the foregoing facts and my training and experience, I believe there is probable cause to believe that

39

STROUD and MCCORRY have committed violations of Title 18, United

States Code, Section 473: Dealing in Counterfeit Obligations or

Securities, and that TALTON and GOLDBERG have committed a

violation of Title 18, United States Code, Section 471:

Counterfeiting Obligations or Securities.

Jason Swierkowski
Special Agent
United States Secret Service


Subscribed and sworn to me

this _____ day of May, 2008

UNITED STATES MAGISTRATE JUDGE

40